## Q.

### Case No. 11,489.

### Ex parte QUACKENBOSS.

[1 N. Y. Leg. Obs. 146.]

District Court, S. D. New York. 1842.[1]

VOLUNTARY BANKRUPTCY — FRAUDULENT PREFER-
ENCES—ACT OF 1841.

By the 2d section of the bankrupt act [of 1841 (5 Stat. 440)], it is declared, "that in case it shall be made to appear to the court in the proceedings in bankruptcy, that the bankrupt, his application being voluntary, has subsequent to the first day of January last, or at any other time in contemplation of the passage of a bankrupt law, by assignment or otherwise, given or secured any preference to one creditor over another, he shall not receive a discharge, unless" &c. The meaning and intention of the legislature is, that in case the bankrupt (his application being voluntary) gives or secures a preference to one creditor over another, at any time subsequent to the first of January, 1841, he is debarred of a discharge; or if he makes such preference at any other time in contemplation of the passage of a bankrupt law, he incurs the same disability. Where, therefore, it appeared that a bankrupt had in December, 1840, declared that the house of which he was a partner would proceed to arrange their affairs, sell their stock of goods at auction to protect some confidential debts, and then make an assignment and await the passage of the bankrupt law, and that prior to 1st of January, 1841, certain preferences had been given to creditors, *held*, that such preferences were made with a knowledge that a bankrupt law was in progress through congress, and the probability of its becoming a law, and were therefore made and given in contemplation of bankruptcy, and that the bankrupt was therefore not entitled to a discharge and certificate.

[In the matter of John M. Quackenboss, a bankrupt. Heard on application for discharge.]

Thompson & Nicol, for creditors.

Mulock & Selden, for petitioner, cur. ad vult.

BETTS, District Judge. Objections are taken on the part of the various creditors to the final discharge of the bankrupt, and full proofs have been given therein before Commissioner Cambreleng. The objections by the different creditors, with some slight diversity in form, concur substantially in these points: First. That the bankrupt in contemplation of the passage of a bankrupt law sometime during the year 1840, by assignment or otherwise, gave or secured a preference to one or more of his creditors over others. Second. That he has so done since the first day of January, 1841. Third. That since the passage of the act, the petitioner in contemplation of bankruptcy has given preferences, &c., bringing the case by proper allegations within the terms of the two first clauses of the second section of the act. Fourth. That the petitioner gave preferences, &c., to creditors since the first day of January, 1841, without averring that it was done in

[1] [Affirmed in Case No. 11,490.]

contemplation of bankruptcy. Fifth. That he has wilfully concealed property in his possession at the time he filed his petition.

It was contended on the argument in behalf of the creditors, that any preference given by the petitioner amongst his creditors since the first of January, 1841, bars him of a discharge, and on the part of the bankrupt it was strenuously urged that he could not be prejudiced by such preference, unless given by him in contemplation of his own bankruptcy or the passage of a bankrupt law. The clause of the act containing the provision most relied on is a paragraph of the second section, and declares: "In case it shall be made to appear to the court in the course of the proceedings in bankruptcy, that the bankrupt, his application being voluntary, has, subsequent to the first day of January last, or at any other time in contemplation of the passage of a bankrupt law, by assignment or otherwise, given or secured any preference to one creditor over another, he shall not receive a discharge, unless, &c., &c." The true reading of the clause is by no means clear and certain. "In contemplation" may, with equal aptitude and consonance with the rules of syntax, be associated exclusively with its immediate antecedent "any other time," or be transferred to the object and subject of action, "the bankrupt," and in the latter case apply alike to preferences made after the first of January, and before that day. If the latter reading be adopted, then no preference whenever made will prevent a discharge, unless it was given in contemplation of the passage of a bankrupt law, and if the other be the true acceptation of the clause, every preference, &c., given since the first of January, 1841, to one creditor over another, will of itself, exclude the bankrupt from the benefit of a certificate. The punctuation of the clause separates it from direct connection with the preceding member, and leaves it an independent one, to stand in junction with that one demanded by the sense and intent of the provision.

The general purpose of congress is distinctly manifested by the introductory part of the section, that forbids a discharge to a bankrupt, who in contemplation of bankruptcy, shall make any future payments, securities, &c., for the purpose of giving any creditor a preference or priority over his general creditors. It has been justly observed by Judge Story that the future in view of congress had relation to the time of the passing of the act, and not the period of its going into operation. Hutchins v. Taylor [Case No. 6,953]. There was accordingly an enactment in force when the clause in question was introduced, which deprived a party of the benefit of a discharge, if in contemplation of bankruptcy he secured a preference amongst his creditors subsequent to the

19th of August, 1841; or if he at any time made a voluntary conveyance or transfer of his property, &c., to any person not being a bona fide creditor or purchaser. These restrictions apply to involuntary bankrupts equally as to voluntary ones; and therefore congress clearly intended to legislate further in respect to the latter, by interdicting the privilege of a discharge to them in the circumstances there indicated, in a manner differing their situation essentially from that of involuntary bankrupts. These circumstances are to be so arranged and interpreted, if practicable, as to give meaning and bearing to every part of the sentence, and also so as not to render it a mere repetition of previous provisions.

In disposing then of the phrase "in contemplation of the passage of a bankrupt law," it must be obvious that congress could not mean to refer it to acts done subsequent to the 19th of August, 1841. The expression in that sense would be absurd, for a person could not be supposed to act with a view to the passage of a law already in existence; and accordingly, if it necessarily attaches to and qualifies both members of the sentence, then the acts there denounced must cease to be of any ill consequence to the bankrupt committing them after the day of the enactment of the law. If, to avoid such implied abrogation of the provisions, contemplation of the passage of a bankrupt law is rendered as tantamount to a contemplation of bankruptcy, (a freedom of version which would be most cautiously used in the construction of statutes,) the expression then would become a mere tautology, leaving the voluntary applicant in identically the same situation he was already placed by the former clause. So, also, the clause itself would embody a mere repetition of idea in the two paragraphs if both carry with them the qualification placed next the last one; for "any other time" anterior would embrace the period intervening after the first of January preceding with equal certainty as if expressed in terms. These are considerations which usually prevail with courts, to give the language of a statute, obscure or equivocal on its face, such construction as shall rescue it from the difficulties they infer. I think it is readily effected in this instance by disregarding the punctuation, at least so far as not to receive that as a certain index of the intention of congress, to break into distinct members a sentence which, without the pause, would naturally read as one, and which union would relieve the whole clause from ambiguity or discrepancy. The meaning I give the section is that in case the bankrupt, his application being voluntary, gives or secures a preference to one creditor over another, at any time subsequent to the first of January, 1841, he is debarred a discharge; or, if he makes such preference at any other time, in contemplation of the passage of a bankrupt law, he incurs the same disability.

The history of the legislation of congress on this subject will tend to confirm this construction of the clause. Without going further back, the journals of both houses of congress show that through the year 1840 memorials from every section of the United States were crowding in, most of them urging strenuously the adoption of a bankrupt law, and some remonstrating against it, but all evincing that the public attention was extensively awakened to the subject. On the first day of April, 1840, a bill was introduced into the senate by Mr. Webster, on notice, and on the third another by Mr. Tallmadge; and both bills were reported back by the judiciary committee, with an amendment by the minority on the 22d of April; and on the 12th of June the bills, after reference to a select committee, were again reported to the senate, with Mr. Wall's amendment; and the same committee, by Mr. Crittenden, also reported on that day a new bill, which latter was passed by the senate on the 25th of June, and subsequently by the house, the 19th of August. (Senate Journal, 1840–41.) From the close of the year 1840 to the final passage of the bill there could, accordingly, be no ground to doubt that the attention of every business man in the community was directed to the subject, nor but that he contemplated such event. Accordingly, congress would aptly adopt the 1st of January, 1841, after which these acts denounced as prejudicial to general creditors, done by a bankrupt, should be accepted to have been done with a view to the operation of that law; and this presumption of law would supersede the necessity of proof of the fact.

Probably no measure of legislation has ever attracted more general attention and remark, and it would be almost as superfluous to require evidence that merchants were aware a bankrupt law was in agitation and might probably pass, and to exact testimony to the fact, as that congress was in session that year. The terms of the statute are, then, made peremptory and absolute as to a voluntary applicant for the benefit of the act, who gives preference to one creditor over another subsequent to that day, and he stands incapacitated to sue for a discharge. When a like preference has been made at any other time, the presumption of law is not applied, and it must be shown by testimony to have been done in contemplation of the passage of the act. A mere speculative expression or conjecture would not amount to the contemplation demanded by the statute. The acts of the party should be such as to evince he shaped his proceedings with a view to the existence of the law, or to provide against its operation; and then he will be deprived of a discharge under it, whether in fact he believed or not that it would pass. Looking forward to and making arrangements for an event would be contemplating its occurrence, although there might be no settled belief, or even expectation, of its arrival. The same

import is not to be affixed to the term "contemplation" in this clause, as in the first members of the same sentence, "in contemplation of bankruptcy" being an act of mind relating to the individual alone, his own secret purpose or thoughts, or his own consciousness of his condition and ability to meet his debts; and, even in respect to this, Judge Story holds that acts of transfer and conveyance of property, fraudulent in regard to the general creditors, would create a legal intention, not to be overcome or counteracted by his actual private intention. Arnold v. Maynard [Case No. 561]. But "contemplation of the passage of a bankrupt law" is not an act of personal purpose, a mere intent springing out of and limited to an individual mind. It is a participation in the common understanding of those connected and acting together in society, and has relation to public polity—the proceedings of government, notorious to everybody, and, accordingly, is to be inferred as a fact in respect to particular citizens, when it becomes a general impression, with the community of which they are members. Vessels hurried to sea, or turned back to port, when the public mind is occupied with questions of war, embargo, or other changes affecting the enterprise, are held to take the step in contemplation of such event, although those deciding and directing their course may not believe the event will happen, and, indeed, may be deeply persuaded of the contrary.

These suggestions as to the construction of the act of congress will have been sufficiently extended to indicate the application of the proofs given in the present case. The bankrupt, on his examination, testified that his house failed in November, 1840, then owing about $100,000, and that preferences were given to secure their endorsers to $20,-000. They also conveyed to one of their largest creditors a house and lot in Buffalo, and secured some further preferences prior to the first of January, 1841. These facts being proved by the bankrupt, his counsel was allowed, by way of cross-examination, to inquire of him whether he made the preferences in contemplation of the passage of a bankrupt law, and he answered that he did not. The counsel for the creditors excepted to the admissibility of the question and answer.

It is not now necessary to discuss or decide the exception, and it will accordingly be passed by, because it is clearly established by the proof that the bankrupt knew efforts were making to obtain the passage of a bankrupt law, that the measure was under consideration before congress; and he declared, in December, 1840, to Mr. Salstonstell, that his house would proceed to arrange their affairs, sell their stock of goods at auction, to protect some confidential debts, and then make an assignment, "and await the passage of a general bankrupt law."

Similar language was used in November or December, 1840, to Mr. Bogardus, a clerk of one of the creditors, the bankrupt making a threat towards some of his creditors, who were pressing the house with suits, "that next winter, congress would, doubtless, pass a bankrupt law. They (the house) would go in for that." In opposition to this, evidence was offered of repeated declarations of the bankrupt in the fall of 1840 that he did not believe a bankrupt bill would be passed by congress; of his having signed a remonstrance against it at that time, and, generally, that he was opposed to the measure; that in the fall, previous to his failure, when prevailed upon by Mr. Jewett to contribute $25 to aid the passage of the law, he declared his belief the bill would not pass, and his opposition to one proposed because it was not compulsory in its character. The competency of these declarations need not be debated now, because it is manifest that, if admissible evidence, they cannot weigh against his more deliberate assertions to his creditors, accompanied by acts of preference; and also because, from the construction of the statute before indicated by the court, preferences made with a knowledge that a bankrupt law was in progress through congress, and the probability or possibility of its becoming a law, being in view by the bankrupt at the time, must be deemed to have been made and given in contemplation of its passage without regard to his private belief.

Second. After the first of January, 1841, a conveyance was made to some creditors in part payment of their debt of a house and lot in Buffalo, and in the same month various cash payments to other creditors of the firm, and in February a full assignment of the effects of the house. This assignment is not furnished the court; it is represented by the petitioner to have been in trust for all the creditors of the firm, and without preferences; and, if of that character, cannot affect the case, such assignment not being interdicted by the act. The conveyance, however, to Jones & Co., and the payments to B. B. Day & Co., Geo. M. Griggs, H. L. Clarke, &c., all being subsequent to the first of January, and each of them giving and securing a preference to one creditor over another, fell directly within the terms of the act declaring "the bankrupt shall not receive a discharge unless the same be assented to by a majority in interest of those of his creditors who have not been so preferred." No such assent being in proof, I, accordingly, refuse to decree a discharge to the petitioner.

The other points made by the objections are not passed upon. The judgment of the court is placed specifically upon this: that the bankrupt, in so far as he made preferences of payment in December, 1840, made them in contemplation of the passage of the bankrupt law, and that the preferences made

after the first of January, 1841, bar his receiving a certificate, whether made in contemplation of the passage of the law or not, there being no such assent of creditors as will save the disability.

[On appeal to the circuit court, the decree of this court was affirmed. Case No. 11,490.]